17-3188 5 Mile Capital Westin North Shore SPE LLC v. Berkadia Commercial Mortgage, LLC, et al. Good afternoon, Your Honors. How do you listen to your quote? Just state your name before you're being recorded. I apologize. Roseanne Ciambrone on behalf of Berkadia Commercial Mortgage, LLC. I would like to skip to the three issues that you raised because I understand that those are the things that you are concerned about, which I hear to be LEMIC, Q6 1.8% use of the discount rate in the causation issue, and the third issue, the judge's conclusion with respect to Greenspan's testimony on the amount the property could have been sold for in 2014. To address your question at the outset of what the burden was, I believe, Your Honors, that under New York law, causation needs to be proved with certainty and the measure of damages with reasonable certainty. And I believe that the standard of review before this Court on every single issue is against the manifest weight of the evidence. Moving on to the LEMIC issue, the testimony on LEMIC was very, very clear. And it is beyond a doubt that our expert, the only expert before the Court with any experience in addressing the LEMIC statute, in representing clients with respect to LEMIC, and with asking for extensions of the three-year grace period was Tom Biafor. Mary testified that she had never seen an extension request before this case, and that she had never asked for such an extension. Lydon, who was Five Miles' additional expert, additionally testified that he had never before asked or represented a client with respect to an extension of the grace period. You also have to consider their specific testimony. And their specific testimony was only that the IRS was liberal in granting extensions by law, and with Lydon, that there is a compelling argument for an extension. In contrast, Tom Biafor testified, and has written extensively on this issue, that while he knows of no properly filed extension having been denied, he also testified that by properly, he means supportable and in accordance with the tax code and regulations. He testified that it was a process that it was taken seriously, and that LEMIC trusts take great care in asking for these extensions because of the nature of what can happen if one is denied. Did he know of any requests that had been denied? He testified that he did not know of any properly filed request being denied, and that is a big, big consideration in his testimony, because LEMIC trusts don't ask for these unless they are relatively certain that they're going to get it because the risk is too large. If, in fact, you are denied a LEMIC extension request of the grace period, you are notified by mail and given only 30 days to sell the property. And if you're given only 30 days to sell the property, you're typically in a situation where you're running an auction, and you have to run the auction. It's acknowledged in the pooling and servicing agreement itself. If you look at Section 3.18 of the pooling and servicing agreement, it requires that in the event that you come up against a grace period and you don't get it, that you require them in the PSA to take it to auction. It is something that is taken very seriously and great care. I understand all of that, but was there any suggestion that this property, had there been a properly filed application, that the property would not have gotten the extension? Tom Balfour testified to that, Your Honor. He testified to it at R405 through 4047 and 4147. He testified as follows, that he has never presented a fact pattern for an extension based on the possibility that the market or property's value may improve. He has never recommended an extension on the concept that holding the property might be advantageous to the trust. He believes that the fact that the property was cash flowing is a bad reason to apply for and runs counter to the requirements for an extension. And he testified that on these facts, he did not believe that the IRS would have approved an extension and he would have never recommended a Renwick Trust request an extension on these facts and that's found at the record at page 4060. Counsel, can I ask you on your client's reliance on the pooling and service agreement relative to their selection of the rate, 1.8, and what's the basis of your selection of 11 or 11.5 percent? So with respect to the pooling and servicing agreement and its requirements with respect to the 1.8 discount rate, there is a big difference in these cases when it's prior to being REO. And the pooling and servicing agreement has different obligations and different requirements. Once a property gets into REO, the testimony here was clear that Section 309 and 3.28, which are the only sections of the pooling and servicing agreement that reflect a note rate, which is the 1.8 percent, and they are only applicable to the period of time before the property becomes REO. And Cusick admitted this in his testimony. It was not a question of fact. It was an established fact admitted to by Cusick that 309, which relates to the enforcement of a due on sale clause, and 3.28 being C, which relate to loan modifications. It is entirely different. When you look at sections 3.17 and 3.18, which actually relate to the sale of REO properties, those sections are silent on a discount rate. But more importantly, if you look at Section 3.18B, which is the section of the pooling and servicing agreement that relates to REO property, Bercadia is required by the contract to consider all information that is available to it. That is a requirement in the contract that it consider all information available to it. And when you look at the information that was available to it at the time, BOVs and appraisals, in addition to how the property was cash flowing at the time, how it was performing, every single run of those data points uses something other than a 1.8% discount rate. It uses something closer to market. There is no requirement in the PSO that they use the 1.8, and if you actually look at the requirements for- What about your opponent's argument that using that standard 1.8 yields consistency in the analysis? It's a red herring, Ronnie. The only portions of the PSA that require a note rate are those portions that relate to the period of time when the note is still in existence, when there is a loan. When there is no longer a loan, the note rate is superfluous. It makes no difference anymore. There's no consistency here to be had. You either have a loan, and the loan is maybe in default, but the loan is in place. Once you get to the period of time where you're post-foreclosure sale, and the trust has actually obtained title to the property through a nominee, it's an entirely different set of facts. There is no valuer in this case that used a 1.8% discount rate. None of the BOVs, none of the appraisals, Greenspan didn't use a 1.8% discount rate, Craig didn't use a 1.8% discount rate. When you're dealing with an REO property, and you're dealing with actual market value of the real estate, the note rate, which is a 1.8% rate, which as we all know is incredibly low, has no place there. It doesn't make any sense to use it. Who were you relying on that gave testimony as to the 11.5? What expert? Oh, there was our expert. Yes. It was Patrick Craig, Your Honor. It was Patrick Craig. But Greenspan did not use a 1.8% discount rate. His discount rate, I think, was in the 10% rate. I think it's 10.25% and 10.75%, but I'm going on memory, and I may be a little bit off. But it was not 1.8%. It wasn't even close. The other testimony that was in the record is from both Greenspan and Craig, our expert as well as Five Mile's expert. They rely on two specific sources for their discount rate and cap rates, and they're called RERC as well as COPATS. And that testimony was in the record. So you're saying Mr. Greenspan who testified for Five Mile, right? Correct. He had a 10% rate? I think it was 10.25. Mr. Dark will look it up for me. I think it was 10.25 and 10.75, depending on the year. Fine. Thank you. It wasn't 1.8. It was not 1.8. He was in the 10% rate, I'm pretty sure. But we'll confirm that for you before I sit down. Thank you. Let me see if I have it. So there's nobody. When you're actually trying to value the property, none of the evidence supports a 1.8% discount rate. If you look at the treatises that everybody looks at to determine these things, RERC and COPATS, they are in the record what those rates were, and they were all significantly higher. Greenspan's rates were significantly higher. The only person who used a 1.8% discount rate was Mr. Cusick. So the RERC rates were between 8% and 10. For CAP rates, they were between 8% and 9.8%. And for discount rates for Midwest first-year hotels, it was testified that they were between 9.9% and 10.6%. And if you look at Greenspan's report, in 2014, he used a 10.25% discount rate. In 2015, he used a 10% discount rate. In 2016, he used a 10.25% discount rate. And in January 2017, he used a 10.5% discount rate. And that was 5 miles expert. Can I ask you about Mr. Olosov? Absolutely. And he was an expert relative to pooling and servicing agreements, is that right? Yes, that's correct. And his testimony, I believe, was that the 1.8% was inappropriate because this is REO property, is that right? That's correct. Is there any witness to testify against that testimony relative who was an expert in pooling and servicing? That the 1.8% was not an appropriate rate? Right. The only other expert on servicing standard was Mr. Cusick. Okay, thank you. So in the end, with respect to REMIC, to wrap up on REMIC, the only expert in this case who had any knowledge, really, of how REMIC works in the real world was Tom Biafor. And his testimony was clear that he did not believe that an extension was available on these facts. We also have the testimony of all of Berkadia's witnesses, all of them, Karp, O'Hanlon, Geschwind, all of them. They say that the grace period is an important consideration, that they don't want to run the risk of taking any time more than allowed by the REMIC rules, that it's not a guaranteed extension, it's an application, and that seeking and receiving a REMIC extension is not normal and usual for Berkadia. I'd like to correct one thing that counsel for five miles said, which was that there was testimony in the record that Berkadia asked for an extension on a different property in this same trust, and that testimony was never admitted into the record. There was a question of Brian Arlesoff, our expert. He testified that there were 327 REO loan service, 327 REO loan service by Berkadia, and only four extensions signed, and when he was asked about a particular loan in this pool, he said that he was not aware of it. There is no testimony to that in the record. I do want to address, for your honors, the Greenspan testimony and the PIP, because I know that's important to you and I do not want to run out of time. So with respect to Greenspan's testimony, what Judge Shurrock found in this case is that in 2014 there would not be sufficient proceeds from a sale of the hotel to result in a return to five mile, and that holding is absolutely correct and it's absolutely supported by the record and by Mr. Greenspan's testimony. Mr. Greenspan testified that in 2014 there would be $64.2 million in net proceeds, and after everything was paid, after those monies go through the waterfall that's in existence in the participation agreement, after the servicer's fees and expenses were paid, after the AP's principal was paid, after the BP's principal and interest was paid, that it results in a loss to England of $2.3 million. That is the testimony in the record, and the judge's conclusion and his finding, which is an evidentiary finding which has absolute basis in fact from Greenspan's testimony, that there was not enough money to pay five mile, according to Greenspan, in 2014, is 100% correct and it's based on the evidence that was before Judge Shurrock. Ms. Zambroni, please wrap up. The last thing that I would say is with respect to cash, that's the last issue that I was not able to consider. Cash is, first of all the cash is double counting. You have to consider the fact that in a discounted cash analysis, cash in the reversionary years is included in that number. You can't count it twice. And the second part of it is it is definitely consequential damages, not general damages, and that is a question of fact. We cited in our brief extensively why it is a question of fact. The case that the five mile sites, Biotronic, finds that it's a fact-intensive inquiry that is for a trial court to consider, and when you look at everything in this record, what Five Mile bought, what Borkadia contracted to do, and what the REMIC rules provide, it is clear that holding a hotel for a buildup of cash is not contemplated. There's one fact that illustrates this more than anything. You have actually run out of time, so please wrap up. Okay. Is that Five Mile, but a loan that was going to mature in 2010, its position is that Borkadia should have run the hotel to run up cash for seven years past the maturity date. It's not general damages, it's consequential. Thank you very much. Thank you. Brief rebuttal, please. Yes. Very briefly, I just want to address a couple of things. Council spent a long time talking about REMIC and the 1.8 discount rate, but I just want to reiterate that both of those really are irrelevant here, because in 2014, which is still within that three-year REMIC period, if the hotel had sold at that date, there would have been damages suffered by Five Mile. And with regard to the 1.8 discount rate, that using their experts' 11 to 11.5 rate, which I think that Council herself said that the publications that talk about discount rates said that the discount rate at the high end was 10.6 at that time, so using that extremely high 11.5 rate, it still shows that a hold would have been superior to a sale. So what's the basis for the number on what it would have sold at in 2014? I'm sorry? What's the basis for the number that the hotel would have sold at? Sure. The basis for the number that the hotel would have sold at was Greenspan's testimony. So if you look at the circuit court's ruling, the circuit court says that the hotel would have had to sell for above a certain number in order for there to be damages. And Greenspan's 2014 number is above that number. And what Council is saying is even Greenspan testified that there wouldn't be sufficient money for Five Mile to recover damages in 2014. That's not accurate in the record. I think if you look at the record, he testified what those sale prices would be. If you look at his sale price in 2014 and you compare it to the circuit court's determination as to where the hotel would have had to sell at to get to damages for Five Mile, it exceeded that amount. But my point with the remake in the 1.8 is that even if you take everything that Council is saying is true, Five Mile still suffered damages. So I would just end by saying that this Court has already ruled that if a breach could be established, which it was, Five Mile would be entitled to whatever the difference in price of an immediate sale and a future sale after the hold period. Five Mile established that breach, yet the circuit court awarded no damages. We would ask that this Court reverse. Counsel, quickly, that was an injunctive relief case, was it not? It was, correct. Are the same issues present here that they were there? The issue of whether or not damages are speculative, I think, was present in both that case and this case. That case, the determination was, was there an adequate remedy at law? As Your Honors are well aware, that's one of the elements for establishing entitlement to injunctive relief. Thank you. Thank you. Thank you for your arguments. The matter will be taken under advisement. This Court is adjourned.